2021 IL App (2d) 190321-U
No. 2-19-0321
Order filed May 21, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-880 |
| LEWIS C. GARCIA, | ) ) | Honorable T. Clint Hull, III |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's felony conviction for resisting a peace officer.

¶ 2    A jury convicted defendant of resisting a peace officer, a Class 4 felony in violation of section 31-1(a-7) of the Criminal Code of 2012 (Code). 720 ILCS 5/31-1(a-7) (West 2016). The crime was elevated from a misdemeanor to a felony, because defendant's actions proximately caused Officer Clark Johnson to become injured. The trial court sentenced defendant to 60 days in the Kane County jail with 24 months' probation and ordered him to pay fines and costs.

¶ 3    Defendant appeals, arguing that the evidence was insufficient to establish that his actions

proximately caused Johnson's injuries. Defendant also argues that the trial court abused its discretion when: (1) ruling on a motion *in limine*, which allowed the State to introduce evidence of seized contraband found in plain view; (2) declining to modify the Illinois Pattern Jury Instructions, Criminal Nos. 22.13X and 22.14X, defining and setting forth the elements of the offense of "resisting or obstructing" a peace officer, when defendant had been charged only with "resisting" a peace officer; (3) failing to instruct the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 26.07, concerning deadlocked juries; and (4) denying his motion for a new trial based on closing argument that, in his view, mischaracterized the testimony of Officer Greg Christoffel. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On May 5, 2017, at 7:15 p.m., a 12-person team of the Aurora Police Department's Special Operations Group executed a search warrant on defendant's residence. The subject of the search warrant was defendant's adult son, Nathan. According to the State, defendant attempted to prevent the police from entering the home, repeatedly closing the door against them even as they used a battering ram to gain entry. When the police finally opened the door, defendant started to run toward the back of the house. Officer Johnson threw a distraction device toward the open doorway, but the device detonated near his hand and face, resulting in third degree burns to his finger, stippling burns to his face, and a perforated eardrum. According to defendant, the police woke him from his nap, and, being disoriented, he did not realize that the police, as opposed to intruders, were attempting to gain entry.

¶ 6        On May 6, 2017, the State charged defendant with one count of resisting a peace officer. The indictment read:

"The Grand Jury charges that on or about May 5, 2017, defendant, LEWIS GARCIA committed the offense of RESISTING A PEACE OFFICER (class 4 felony) in violation of Chapter 720, Act 5, Section 31-1(a-7) of the Illinois Compiled Statutes as amended, in that the defendant knowingly resisted the performance of Investigator Johnson of an authorized act within his official capacity, being the execution of a search warrant, knowing Investigator Johnson to be a peace officer engaged in the execution of his official duties, in that he knowingly pushed the door closed as officers tried to open the door, thereby causing injury to Investigator Johnson and said resisting was the proximate cause of said injury."

¶ 7                    A. Pre-Trial Rulings: The Parties' Motions *in Limine*

¶ 8      Defendant moved *in limine* to exclude evidence of other crimes or bad acts. In particular, he sought to exclude evidence that he was on probation for possession of a controlled substance at the time of the charged offense. He also sought to exclude evidence of the items recovered during the execution of the search warrant, including ammunition, cocaine, and a digital scale. Defendant argued that the items had limited probative value, because it was his son, Nathan, who had been the subject of the search warrant. Defendant was not charged in connection with the seized items, and any reference to them could prejudice the jury against him.

¶ 9      The State, in turn, sought to exclude evidence that Nathan, not defendant, had been the subject of the search warrant. (It pointed to case law holding that the name of the subject of the search warrant was hearsay.)

¶ 10      At the hearing on the motion, defendant acknowledged that the parties' respective motions went "hand-in-hand" with one another, and the trial court would likely take a broad view of the case when ruling on the motions. Accordingly, defendant urged that, if the seized items were

referenced at trial, it should be made clear to the jury that defendant's son had been the subject of the search. Nevertheless, defendant maintained that the seized items were not relevant, "unless the State can somehow prove that [defendant] knew what was in the residence *** and that [knowledge] was the reason, for argument's sake, to attempt to keep the police out of the residence."

¶ 11    The State responded by showing the judge a picture of the dining room table where much of the contraband was found. It argued: "[O]n that table, there is cocaine, there is a scale, there are numerous items. *** For Counsel to say that we cannot tie up the fact that [defendant] knew what was on his own dining room table where he was [ultimately apprehended], I don't believe that is credible, Judge."

¶ 12    The trial court stated that it would take the matter under advisement. However, it also stated:

> "[A]lthough *** I'm going to look through it, my initial response would be that I do believe that the items that were in plain view, the contraband, would be proper for the State to get into to explain why [defendant] could potentially be taking the action that he did.
>
> However, I would also agree with [defense counsel] that if the State is going to get into a general description of the contraband that was recovered, [then] the fact that [defendant] was not the subject of the search warrant would give context to complete the picture."

¶ 13    Defense counsel then asked the court to clarify what it meant by plain view. She noted that the police recovered items not only from the first-floor dining room and living room but also from

closed drawers in bedrooms. The court answered that it meant items from the first-floor dining room and living room, not from closed drawers in the bedrooms.

¶ 14   The trial court entered a written order on the motions *in limine*. It granted in part and denied in part each of defendant's motions. As to defendant's status on probation, it wrote:

"The State will be allowed to introduce evidence that the [d]efendant was on probation at the time the search warrant was executed. The State may also introduce evidence of the conditions of the probation. This evidence is relevant to the [d]efendant's intent and state of mind when considering the contraband that was located on the first floor and in plain view and would constitute a violation of his probation. The State is not allowed to introduce the offense he is on probation for, Unlawful Possession of a Controlled Substance. The nature of the offense has no probative value and is more prejudicial than probative."

¶ 15   As to the seized items, it wrote:

"The State will be allowed to introduce evidence of the items that were recovered from the first floor and in plain view. This evidence is relevant and is evidence [of] [d]efendant's intent and state of mind at the time the police were attempting to gain entry into the home in the execution of their official duties. The State will not be allowed to introduce evidence of any other items of contraband recovered from the residence not in plain view on the first floor without first laying a sufficient foundation that the [d]efendant had knowledge of the recovered contraband."

¶ 16   It denied the State's motion to exclude evidence that Nathan, not defendant, had been the subject of the search warrant.

¶ 17                                   B. Trial

¶ 18                                     1. The State's Case

¶ 19    Five officers testified for the State: Christoffel, Johnson, Kyriako Vogiatzis, Chris Converse, and Bryan Hammond. All were members of the Aurora Police Department's Special Operations Group who participated in the execution of the search warrant on defendant's home. The testimony of Christoffel and Johnson is particularly relevant to the issues on appeal. The remaining officers testified consistently with Christoffel and Johnson, as well as with one another, and we largely combine their account of the facts.

¶ 20    Vogiatzis led the execution of the search warrant on defendant's home. It was approximately 7:15 p.m., and, being May, it was still daylight. He assigned six officers, including himself, to stand on defendant's front porch. The remaining six officers were stationed elsewhere on the property, including at the home's back exit. All officers were in "subdued" uniform, meaning that they wore jeans, a black shirt that said "police" on the sleeves, and a vest that said "police" on the front and back. The officers wore the same uniform to court, so the jurors had an opportunity to see it. Several squad cars parked on the property, two of which were marked, and one of which had flashing lights.

¶ 21    Vogiatzis knocked loudly on the front door and yelled "Aurora Police Department, search warrant, open the door." He repeated the announcement three to four times. Vogiatzis demonstrated for the jury how he knocked and how he yelled "police." When defendant did not open the door, Vogiatzis ordered that Hammond use the battering ram. According to Hammond, he was able to open the door "a couple of inches," but defendant pushed it shut. This happened four to six times.

¶ 22    Christoffel, in slight contrast to Hammond, testified that, after the first strike of the battering ram, the door opened as wide as 1 ½ feet.  Christoffel obtained a "clear view" of defendant's face.  Defendant's eyes were open.  The following exchange occurred:

"Q. Did you make eye contact with the defendant?

A. I don't know if the defendant was looking directly at me, but I saw his face as the door opened."

Christoffel further testified that, after he saw defendant's face, defendant shut the door.  Christoffel explained: "Hammond continued to ram the front steel door there.  I then observed it was approximately four more times to open and shut, open and shut upon every strike."

¶ 23    During cross-examination, the Christoffel again addressed the moment that he saw defendant's face:

"Q. Okay, now, *** you didn't see [defendant] stick his head out and look around.  Would that be fair to say?

A. No.

Q. You could see him from where you happened to be angled?

A. Correct.

Q. And you told us that you don't know if he saw you or if he was looking at you?

A. Correct, I do not."

¶ 24    Following the fifth or sixth ram, the door opened permanently, and several officers saw defendant leave the entryway and run toward the back of the house.  At this point, Johnson attempted to throw a distraction device into the doorway.

¶ 25    Johnson was a member of the Special Operations Group, and he had participated in the execution of 150 to 200 search warrants.  He explained his role in executing the instant warrant:

"I was assigned to make entry with the team; but prior to making entry, I was to deploy the distraction device." The distraction device is cylindrical in shape, four to five inches long and 1 ½ to 2 inches in diameter. It is capped at one end, where it can be unscrewed to place a charge inside the unit. A safety pin and spoon at the top keep it from detonating. Once the pin is pulled, the spoon drops away. The device does not have a timer. Rather, it detonates upon hitting a solid object.

¶ 26    Johnson was stationed on the front porch, four to five feet from the front door. Johnson stood behind Officer Swastek (first name not stated), so close that their vests touched. Swastek held a ballistic shield to protect the officers from bullets. Johnson was six inches taller than Swastek, so he believed that he could easily throw the device over the shield.

¶ 27    Again, Johnson attempted to throw the device into the open doorway: "Typically, we just lob it right into the front entry point." This time, however, the device detonated before it hit the floor. This had never happened before. The device detonated well into the arc of the throw. Johnson's arm was in a forward position and he had already released the device from his hand. He also had moved forward to stand 1 ½ feet from the front door.

¶ 28    Johnson was not certain what the device hit. He testified:

"Q. Okay. Did you see—or was anything struck as a result or did it just go off?

A. It immediately went off as soon as I let it go. I was—my attention was directed towards the person running."

¶ 29    Johnson clarified, however, that he did not believe the device spontaneously detonated:

"Q. But it's fair to say that the device didn't behave the way those devices had for you on prior occasions?

A. *No. The device behaved like it's supposed to. It hit a solid object and detonated.*

Q. Still close to your hand?

A. Yes.

Q. You don't know what it hit?

A. No, I do not.

Q. You couldn't see what it hit?

A. No.

Q. Could it have been part of the house?

A. Yes.

Q. Could it possibly have been the shield that was in front of you?

A. Not the shield.

Q. Could it have been another object?

A. Yes." (Emphasis added.)

¶ 30    Johnson testified to his decision to use the distraction device and the timing of his decision:

"Q. And do you recall approximately what time you pulled the pin?

A. No, I don't.

Q. Okay. Would it have been before the ramming started?

A. No. It would have been when the ramming started.

* * *

Q. And when you were using this *** device, why did you use it at that particular

moment?

A. Because we had met resistance at the door, and the purpose of the distraction

device is to make people look away as we make entry."

¶ 31    Johnson then testified to when the device is used, generally:

"Q. And would it—so it would be utilized to assist you and other officers to get inside the house, if there is resistance?

A. Or even at any time, just to give us the opportunity to make entry quickly into the house without *** being seen prior thereto."

¶ 32    Vogiatzis also testified to when the device is used, generally. We quote a larger portion of his testimony, which also addresses the battering ram, for context:

"Q. And do you always breach a door with this battering ram when executing search warrants?

A. If it's necessary, we always check to make sure the door is unlocked, where we don't have to breach it.

Q. Same thing about a distraction device. Is a distraction device always utilized in executing a search warrant?

A. No.

Q. When wouldn't you use that?

A. When wouldn't we?

Q. Yes.

A. If the door is open and we see people there and they follow our command to stop, there is no reason to deploy that distraction device."

¶ 33    Vogiatzis testified that defendant told him, during an initial interview, that he thought intruders were at the door. Defendant explained to Vogiatzis that, recently, someone shot a bullet into his house.

¶ 34    At the close of the State's case, defendant moved for a directed verdict. The trial court denied the motion.

¶ 35                              2. Defendant's Case

¶ 36    Defendant testified on his own behalf. He acknowledged that he was on probation at the time of the charged offense, and a condition of his probation was that he was not to commit any new offenses. According to defendant, on the day of the charged offense, he arrived home after a long day of work painting houses and fell asleep on the living room couch. He did not notice the contraband on the dining room table, which belonged to his son. He awoke to the sound of knocking at the door. He was tired, and he did not hear Vogiatzis yell "police." Instead, he was concerned that intruders were at the door because, the month before, someone shot at the house. Therefore, he closed the door and looked through the peephole. He then felt the door swing open, and he heard a bang. He turned to walk toward the dining room, because he felt something in his eye and he wanted to see if he was hurt.

¶ 37    Defendant also explained that he did not hear the police announce their presence, because his hearing was impaired from years of service in the military and from working in a factory. However, defendant acknowledged during cross-examination that he was able to hear the State's questions.

¶ 38                              3. Closing Argument

¶ 39    Relevant to this appeal, the State argued in closing that defendant was aware that police, not intruders, were trying to gain entry into his home. In support thereof, it pointed to Christoffel's testimony:

> "[T]he testimony is that defendant looked out of the door at one point to a porch or a porch and stairs full of fully uniformed police officers. That was what Officer—or Investigator Christoffel told us yesterday. At one point after the first ramming, the

defendant's eyes looked out the door. And he could see at that point all of these peace officers."

And,

"[T]o circle back. [Defendant] looked out of the door. That's what Investigator Christoffel told us. He looked out of the door and saw all these police after his door was rammed open, and then he shut it immediately."

¶ 40 Defendant did not object to this argument. Rather, he addressed Christoffel's testimony in his own closing:

"But let's think about one of the things in particular that [the State] talked to you about. *** [Defendant] stuck his head out and looked around and saw all the police officers. [The State] said Investigator Christoffel told you that.

First of all, that's not what Investigator Christoffel told you during his testimony, if you remember. And I hope you have taken notes or that maybe your memory is better than some of ours. Investigator Christoffel said at some point the door came open, he was at a vantage point—here. ***.

*** The door opens a little, I do think its fair Investigator Christoffel has the best vantage point to see what's going on. ***.

*** So I'm not doubting that Investigator Christoffel saw someone's face, saw [defendant's] face. But even he told you he didn't stick his head out and look around. He told you he didn't know what [defendant] had seen, if he had seen him or not. So let's not overblow that piece of evidence."

¶ 41 In rebuttal, the State again addressed Christoffel's testimony:

"I'm going to address as far as Investigator Christoffel. ***[I]t's pretty much agreed that the defendant is the one behind the door pushing it, trying to push it closed, and that Investigator Christoffel saw him.

And from the evidence and testimony, the State's recollection was that the defendant's eyes were open from when at least one of the strikes and—at the point when the door is being opened."

¶ 42                                4. Jury Instructions

¶ 43    The court held a jury instruction conference. It addressed several instructions regarding the resisting charge. Instruction Nos. 12 and 15 defined the offense and set forth the issues for *resisting or obstructing* a peace officer, generally. IPI Criminal Nos. 22.13X ("Definition of Resisting or Obstructing a Peace Officer ***") (approved May 4, 2018) and 22.14X ("Issues in Resisting or Obstructing a Peace Officer ***") (approved May 4, 2018). Instruction Nos. 7 and 16 specifically informed the jury that defendant was charged with *resisting* a peace officer. IPI Criminal Nos. 2.01 ("General Charging Instruction") (approved December 8, 2011) and 26.01 ("General Concluding Instruction") (approved December 8, 2011). Instruction Nos. 17 and 18 were the verdict forms of "guilty" and "not guilty" for *resisting* a peace officer. IPI Criminal Nos. 26.02 ("Not Guilty") (approved December 8, 2011) and 26.05 ("Guilty") (approved December 8, 2011).

¶ 44    The trial court gave the applicable definition and issues instruction for resisting or obstruction a peace officer, without modification, as follows. Instruction No. 12, as given, provided:

"A person commits the offense of resisting or obstructing a peace officer causing injury when he knowingly resists or obstructs the performance of any authorized act within

the official capacity of one known to him to be a peace officer, and his doing so is the proximate cause of the injury to the peace officer."

Instruction No. 15, as given, provided:

"To sustain the charge of resisting or obstructing a peace officer causing injury, the State must prove the following propositions:

*First Proposition*: That Investigator Johnson was a peace officer; and

*Second Proposition*: That the defendant knew Investigator Johnson was a peace officer; and

*Third Proposition*: That the defendant knowingly resisted or obstructed the performance by Investigator Johnson of an authorized act within his official capacity; and

*Fourth Proposition*: That when the defendant did so, he proximately caused an injury to Investigator Johnson.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 45    The trial court *initially* agreed to modify the issues instruction (Instruction No. 15):

"[DEFENSE COUNSEL]:    I know this is the way the IPI reads. [However,] my client is indicted as resisting a peace officer[,] and the definition that we have earlier in the instructions is resisting a peace officer. This should, for consistency['s] sake, say resisting a peace officer, [and] obstructing should come out.

THE COURT: [State?]

[THE STATE]: I don't believe it's bracketed as far as resisted ***.

THE COURT: It is not. However, *** I do believe that it would be appropriate to modify it so that it reflects and is parallel to the charging document."

¶ 46 At the close of conference, however, defense counsel noted that Instruction No. 12 also contained the words "or obstructing." She asked that the court strike the words "or obstructing" there as well. The State added: "Judge, it's true. We just wanted to bring it to the Court's attention. I'm not sure if this changes the court's position. I'm looking at 22.13 again, the definition. It says resisting or obstructing. It doesn't have a bracket between the two[,] *** [s]o we believe that it should be given as it's stated."

¶ 47 The trial court reversed course, declining to modify either the definition or the issues instruction to remove reference to "obstructing." It stated:

"I'm glad everyone brought that to my attention. And it's unfortunate for all of us that we didn't pick up on that. But based upon the way that the instruction reads and based upon the fact that it's not in parentheses, it's not just a [*sic*] perfunctory. So what we're going to do is we're going to go back. *** I am going to keep the language, to sustain the charge of resisting or obstructing, and also keep that in on the issues instruction."

¶ 48 Thus, Instruction Nos. 12 and 15 retained the entire phrase "resisting or obstructing."

¶ 49                                 5. Deliberation

¶ 50 The jury deliberated for 7 hours and 15 minutes. During that time, it asked four questions, which the trial court answered as follows: (1) "Is the Investigator's report part of the evidence?" (Answer given at 2:55 p.m.: "The Investigator's report is not evidence, as the report has not been entered into evidence."); (2) "Can we see written testimony of [Christoffel]?" (Answer given at

3:08 p.m.: "We will have a transcript of [Christoffel's] testimony prepared. This will take time as the court reporter must type up the testimony [and] proof it. Please continue with your deliberations while the transcript is being prepared."); (3) "What is the definition of reasonable doubt?" (Answer given at 3:18 p.m.: "We cannot give a definition of reasonable doubt. It is your duty to define it."); and (4) "If no agreement is reached how do we continue?" (Answer given at 3:47 p.m.: "You will be brought back [and] given a further instruction.")

¶ 51    The Christoffel transcript was subsequently provided to the jury in the course of their deliberations. As to question four, the common-law record contains the jury's handwritten question and the trial court's handwritten answer. However, the report of proceedings does not include the discussion related to question four and reflects only that: "a recess was had, after which proceedings were had in open court outside the presence of the jury ***." The jury never asked for, nor did the court provide, further instruction. Instead, three hours after the court answered question four, the jury returned a guilty verdict.

¶ 52    Defendant filed a post-judgment motion, raising the same issues as on appeal. The trial court denied the motion on the pleadings and proceeded to sentencing. It sentenced defendant as stated. This appeal followed.

¶ 53                                      II. ANALYSIS

¶ 54    On appeal, defendant argues that the evidence was insufficient to establish that his actions proximately caused Johnson's injuries. Defendant also argues that the trial court abused its discretion when: (1) ruling on the motions *in limine*; (2) declining to modify the IPI instructions; (3) failing to instruct the jury pursuant to IPI Criminal No. 26.07, concerning deadlocked juries, in response to the jury's fourth question ("If no agreement is reached, how do we continue?"); and (4) denying his motion for a new trial based on closing argument that purportedly mischaracterized

the Christoffel's testimony. For the reasons that follow, we reject defendant's arguments and affirm.

¶ 55                                    A. Sufficiency of the Evidence: Proximate Cause

¶ 56    Defendant argues that his conviction for the Class 4 felony of resisting a peace officer should be reduced to a Class A misdemeanor, because the State failed to prove beyond a reasonable doubt that his actions were the proximate cause of Officer Johnson's injuries. When a defendant challenges the sufficiency of the evidence, the question for this court is whether, viewing the evidence in a light favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). We defer to the trier of fact on matters of witness credibility and the weight to be afforded to the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). It is not our role to retry the defendant or substitute our judgment for that of the trier of fact. *Id.* We will not overturn a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Collins*, 214 Ill. 2d at 217.

¶ 57    Section 31-1 of the Code delineates the offense of resisting or obstructing a peace officer as follows:

"31-1. Resisting or obstructing a peace officer, firefighter, or correctional institution employee.

(a) A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor.

* * *

(a-7) A person convicted for a violation of this Section whose violation was the proximate cause of an injury to a peace officer, firefighter, or correctional institution employee is guilty of a Class 4 felony." 720 ILCS 5/31-1(a), (a-7) (West 2016).

¶ 58    Defendant accepts that the evidence was sufficient to establish that he knowingly resisted a peace officer's performance of an authorized act within the officer's official capacity, *i.e.*, the execution of the search warrant. Defendant argues only that the State did not establish that doing so was a proximate cause of Johnson's injuries.

¶ 59    Our supreme court has held that the civil definition of proximate cause applies in criminal cases. See *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) (" 'causal relation is the universal factor common to all legal liability' ") (quoting *People v. Lowery*, 178 Ill. 2d 462, 466 (1997)). Also, this appellate court has applied the civil definition of proximate cause to section 31-1(a-7) of the Code. See *People v. Cervantes*, 408 Ill. App. 3d 906, 909 (2011).

¶ 60    Proximate cause consists of two components: cause-in-fact and legal cause. *Hudson*, 222 Ill. 2d at 401. When considering cause-in-fact, courts may employ either the "but for" test or the "substantial factor" test. *Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 23. Under the "but for" test, "a defendant's conduct is not the cause of an event if the event would have occurred without it." (Internal quotation marks omitted.) *Id.* Under the "substantial factor" test, a defendant's negligence is a cause-in-fact if it was a material and substantial factor in bringing about the injury. *Id*.

¶ 61    Legal cause, in turn, is "essentially a question of foreseeability." *Hudson*, 222 Ill. 2d at 401. An injury is foreseeable if it is of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* The extent of the injury or the exact way it occurred need not be foreseeable. *Stanphill v. Ortberg*, 2017 IL App (2d) 161086, ¶ 32. At the same time, the injury

should not be so highly improbable that imposing liability would not be justified. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992). Stated another way, "even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result." *Hudson*, 222 Ill. 2d at 401 (quoting 1 W. LaFave, Substantive Criminal Law § 6.4, at 464 (2d ed. 2003)).

¶ 62    The parties agree that *Cervantes* is instructive. In *Cervantes*, the police suspected the defendant of committing a hit-and-run following a car accident. They attempted to perform a traffic stop on the defendant, but the defendant kept driving. The defendant ultimately pulled over, exited his vehicle, and fled on foot. The police pursued him, over ice and snow. One officer sustained injuries during the chase. Specifically, he sprained his finger and sustained abrasions to his forehead when he slipped on ice. He also sustained abrasions to his shin when he climbed a fence. Following a bench trial, the trial court convicted defendant of resisting a peace officer pursuant to section 31-1(a-7). *Cervantes*, 408 Ill. App. 3d at 908.

¶ 63    On appeal, the *Cervantes* defendant argued that the State failed to prove that his conduct proximately caused the officer's injuries. *Id*. He maintained that he did not punch or kick the officer and that the weather conditions constituted extraordinary circumstances that relieved him of liability. *Id*. This court disagreed. *Id*. at 909. We explained that, when the defendant chose to run from the police, it was foreseeable that the officers would continue to chase on foot and, in doing so, might be injured by falling on snow or ice. *Id*. The wintery conditions were not the type of extraordinary circumstance that would break the causal connection. *Id*.

¶ 64    Here, defendant argues that his actions were not the: (1) cause-in-fact of Johnson's injuries, because Johnson would have used the device regardless of defendant's actions; or (2) legal cause

of Johnson's injuries, because "[n]o reasonable person could foresee that his initially pushing a door closed would result in Johnson suffering from hearing loss or third degree burns on his finger." Additionally, though defendant does not use this terminology, defendant argues that the malfunction or improper use of the device constituted an intervening efficient cause that broke the causal connection between his original wrong and Johnson's injury. This final argument is, essentially, a cause-versus-condition argument, and we address it at the end of our analysis.

¶ 65    Defendant argues that his conduct was not a cause-in-fact of Johnson's injuries, because Johnson would have used the device regardless of defendant's actions. In support, defendant asserts Johnson did not deploy the device until after the door opened. Johnson could not have believed that defendant was continuing to block the door, because Johnson saw defendant running away.

¶ 66    Defendant misstates the evidence. Johnson did not deploy the device after the door opened. True, he tried to *throw* the device after the door opened; that is how the device is meant to be used. However, he made the decision to pull the pin "when the ramming started." He testified that he used the distraction device "*because* [the officers] had met resistance at the door." (Emphasis added.) Moreover, that Johnson saw defendant running away does not help defendant's case. As Vogiatzis testified, the Special Operations Group does not use a distraction device if a subject opens the door and "follows [a] command to stop," *i.e.*, if a subject is cooperative. Defendant's act of running away corroborates the officers' narrative that defendant created a situation which, in their experience, called for the use of a distraction device.

¶ 67    We appreciate defendant's point that an officer might choose to deploy a distraction device even when a suspect is not physically resisting entry into the residence, such as when an officer wants an opportunity "to make entry quickly *** without being seen prior to." However, in this

case, Johnson did in fact choose to use the device because he met resistance. Again, Vogiatzis, who led the operation, clarified that the device would not have been used if defendant had cooperated from the beginning. Given the testimony of Johnson and Vogiatzis, a rational juror could have concluded that defendant's decision to resist the officer's entry into the home was a cause-in-fact of Johnson's injury.

¶ 68    Defendant next argues that his conduct was not the legal cause of Johnson's injuries, because "no reasonable person could foresee that his initially pushing a door closed would result in Johnson either suffering from hearing loss or third degree burns on his finger." Defendant also attempts to distinguish *Cervantes*. He argues that, "[u]nlike wintery conditions, which were immediately apparent to the defendant in *Cervantes*, Johnson's use of a faulty distraction device and the resulting injuries were unforeseeable to a reasonable person."

¶ 69    We disagree that no reasonable person could foresee that defendant's actions would cause the type of injury suffered by Johnson. In a light most favorable to the State, a rational juror could have determined that there was a heavy police presence on the property and that defendant was aware of it. There were several squad cars, two of them marked, and at least one of them with lights flashing. Vogiatzis yelled "police" several times and banged on the door. Defendant did not answer the door, and Hammond used a battering ram to gain entry. According to Vogiatzis, Hammond used the battering ram four to six times. During the officers' attempt to gain entry, the door swung open as wide as 1 ½ feet. At that time, defendant had an opportunity to see six officers standing close together on the porch. He would have seen that one officer held a shield and, consequently, he would have been alerted that the officers were prepared for gunfire. He also would have seen that one officer was using the battering ram to gain entry. According to Christoffel, defendant closed the door against the battering ram four times after the door first

swung open and defendant looked out.  Just as the defendant in *Cervantes* was aware of the wintery conditions, defendant here was aware that the police were using force to gain entry into his home and, still, he continued to resist.  Any reasonable person could foresee that, in continuing to push a door shut against a battering ram, someone could get injured.

¶ 70    We recognize that defendant may not have foreseen the exact manner in which Johnson would be injured and may not even have been aware that police utilize distraction devices. However, specific foresight is not required.  See *Stanphill*, 2017 IL App (2d) 161086, ¶ 32. Reasonable people are certainly aware that police do not act with their hands alone.  When appropriate, police may use battering rams, guns, and any number of weapons and tools.  When, because of defendant's actions, the police resort to the use of such force to gain entry into a home and, still, are met with continued resistance, it is reasonably foreseeable that a tool used to gain entry could injure an officer.  It is not necessary, however, to show that the exact manner in which the injury occurred or the extent of the injuries, *i.e.*, burn to fingers, stippling burns to the face, and a perforated eardrum, are foreseeable.  *Id*.

¶ 71    Finally, we address defendant's claim that he should not be held accountable for Johnson's injuries, because the distraction device malfunctioned or was not properly operated.  Defendant argues: "Either the device malfunctioned or was not properly operated, neither of which were caused by [defendant's] conduct."  This is a cause-versus-condition argument.

¶ 72    Cause-versus-condition cases are a subset of proximate-cause case law.  *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 259 (1999).  If the defendant's conduct merely furnishes a condition by which the injury is made possible, but an independent force or act of a third person causes the injury, then the defendant is not the cause of the injury.  *Id*. at 257.  The new cause is known as the intervening efficient cause.  *Id*. The intervening efficient cause is a new and

independent force that breaks the causal connection between the original wrong and the injury, and it becomes the cause of the injury. *Id.* The test is whether the defendant might have anticipated the intervening efficient cause as a natural and probable result of his or her own negligence. *Id.*

¶ 73    Here, the evidence, viewed in a light most favorable to the State, does not support defendant's position that a malfunctioning device or Johnson's improper operation of the device was a new and independent force that broke the causal connection between defendant's original wrong of resisting the police and Johnson's injury. First, the evidence did not establish that the device malfunctioned. Johnson testified that the device did not spontaneously detonate but, rather, hit a solid object. He stated: "No. The device behaved like it's supposed to. It hit a solid object and detonated." Defendant notes that Johnson was unable to specify *which* solid object the device hit. However, it was for the jury to resolve that question. The jury may have reasonably trusted that Johnson, who had experience with the device, sensed an impact but could not identify the source. Also, the jury may have reasonably inferred that defendant's actions made it difficult for Johnson to discern which solid object the device hit. Johnson testified that his attention was on defendant, who was running away, when the device detonated.

¶ 74    Second, there was no evidence that Johnson improperly operated the device. Defendant did not seriously advance this theory before the jury, and at times he directly contradicted it in order to bolster his primary position that the device simply malfunctioned. As defendant argued in closing: "[T]hese officers who deploy the distraction device in the course of their job, they're given training ***. He knows how that works. *** [W]hen it hits a surface, that's when it's going to go off. That's not what happened here." In any event, we cannot say, as a matter of law, that any improper operation of the device by Johnson would constitute an intervening efficient cause breaking the causal connection between defendant's resistance and Johnson's injury. To the

contrary, the jury could have found that defendant's resistance created a chaotic situation that made it difficult for Johnson to properly deploy the device.

¶ 75    The evidence was sufficient for a rational trier of fact to determine that defendant's actions were the proximate cause of Johnson's injuries.

¶ 76                           B. Motion *in Limine*: Seized Contraband

¶ 77    Defendant challenges the trial court's ruling on his motion *in limine* to exclude evidence of other crimes or bad acts.  He now accepts the trial court's decision to allow evidence that he was on probation at the time of the charged offense.  However, he argues that the trial court should have excluded evidence of all contraband which was in plain view.  The admissibility of other-crimes evidence is within the trial court's discretion, and we will not disturb its decision absent an abuse of that discretion.  *People v. Pikes*, 2013 IL 115171, ¶ 12.  A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the court.  *People v. Edwards*, 343 Ill. App. 3d 1168, 1183 (2003).

¶ 78    A trial court must exercise caution in admitting evidence of other crimes, wrongs, or bad acts committed by the defendant.  See *Pikes*, 2013 IL 115171, ¶ 12.  The concern is that such evidence might persuade the jury to convict the defendant only because it feels that the defendant is a bad person deserving of punishment.  *Id*. ¶ 16.  As such, other-crimes evidence may not be admitted to show the defendant's propensity to commit crime.  *Id*.; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).  However, other-crimes evidence is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime.  *Pikes*, 2013 IL 115171, ¶ 11.  Commonly accepted bases for admitting other-crimes evidence include to prove *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime with which the defendant

has been charged. *Id.* As with any relevant evidence, the court must consider whether the probative value of the other-crimes evidence is outweighed by its prejudicial effect. *Id.*

¶ 79    Defendant argues that the trial court abused its discretion, because the probative value of the evidence was outweighed by its prejudicial effect. Defendant contends that the evidence was not probative of his state of mind, because there was no evidence that defendant attempted to conceal the contraband on the dining room table. Defendant also contends that the evidence was unduly prejudicial, because defendant was not charged in connection with the contraband. We disagree.

¶ 80    The trial court reasonably determined that the contraband was highly probative of defendant's state of mind, intent, and motive to prevent the police from entering the home. Contrary to defendant's position, the State need not have shown that defendant attempted to conceal the contraband on the dining room table in a literal sense by, for example, covering it with a tablecloth. Rather, as defendant acknowledged below, the State need only show that defendant knew of the contraband on the dining room table. If the defendant knew of the contraband on the dining room table, then he would be motivated to prevent the police from seeing it. This is particularly true where the possession of cocaine could constitute a violation of his probation. In effect, attempting to prevent police from entering the home *was* an attempt to conceal the contraband.

¶ 81    Also, the trial court was mindful to limit the prejudicial impact of the evidence. The court limited evidence of the contraband to that which was found in plain view. It excluded evidence of contraband found in bedroom drawers. Whether defendant had knowledge of contraband found in plain view was a fair question to put before the jury and relevant to defendant's possible motive for resisting. Moreover, as defense counsel acknowledged below, evidence of the contraband was

best viewed in conjunction with the other evidence. In this vein, the court allowed defendant to make clear that Nathan, not defendant, had been the subject of the search warrant. The court also excluded evidence of the specific offense for which defendant was on probation, possession of a controlled substance. The court determined that allowing the jury to learn that there was cocaine in the house and that defendant was on probation for possession of a controlled substance would be unduly prejudicial. We cannot say that in striking this balance the trial court abused its discretion.

¶ 82                          C. Jury Instruction Nos. 12 and 15

¶ 83    Defendant challenges the trial court's refusal to strike the references to "obstructing" from the definition and issues instructions, for resisting or obstructing a peace officer as set forth in IPI Criminal Nos. 22.13X and 22.14X, respectively. These IPIs provide the term "resisting or obstructing" and there is no blank space or bracket to indicate that the court should alter the term to more specifically fit the facts of the case. In contrast, the charging instrument instruction, general concluding instruction and verdict forms all leave a blank for the name of the offense, which was filled in here with the offense "resisting a peace officer." Defendant argues that the trial court abused its discretion when it declined to modify the definition and issues instructions to strike the words "or obstructing," because not doing so resulted in jury confusion.

¶ 84    The purpose of jury instructions is to provide the jury with the correct statement of the law which it should apply to the evidence to reach a proper verdict. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). Jury instructions should not be misleading or confusing. *People v. Bush*, 157 Ill.2d 248, 254 (1993). When the IPI Criminal contains an applicable instruction, and the trial court determines that the jury should be instructed on the subject, then the IPI Criminal Instruction "*shall* be used, unless the court determines that it does not accurately state the law." (Emphasis added.)

Ill. S. Ct. R. 451(a) (eff. April 8, 2013); *People v. Sperry*, 2020 IL App (2d) 180296, ¶ 13. The decision to give or refuse a non-IPI or modified-IPI is reviewed for an abuse of discretion. See *People v. Simms*, 192 Ill. 2d 348, 412-13 (2000).

¶ 85    Here, defendant appears to concede that the definition and issues instruction, which mirrored the IPI Criminal Instructions, accurately state the law. His complaint, however, is that the inclusion of the term "obstructing" in those instructions is confusing where it was not included in the name of the offense inserted in the charging instrument and verdict instructions.

¶ 86    The case upon which defendant relies, *People v. Jenkins*, 69 Ill. 2d 61 (1977), is distinguishable. In *Jenkins*, the trial court gave two separate instructions on the issue of justifiable force. *Id*. at 64. One instruction accurately stated the law and the other did not. *Id*. at 63. Because the instructions were in direct conflict with one another, the instruction that accurately stated the law could not cure the error that resulted from presenting the jury with the instruction that inaccurately stated the law. *Id*. at 66. The jury should not have been put in the position of having to select the proper instruction. *Id*. at 67. Here, however, the slight alteration in the name of the offense did not cause the jury to choose between conflicting instructions; moreover, all of the instructions at issue accurately state the law.

¶ 87    We recognize that the trial court wavered in its decision to retain the words "or obstructing" in the definition and issues instructions. However, this does not support the conclusion, as defendant argues, that the jury was actually confused such that he was prejudiced. Indeed, we note that though the jury asked four questions during deliberation, none of those questions pertained to resisting vis-à-vis obstructing arrest.

¶ 88    Lastly, defendant, citing to *People v. Elhert*, 274 Ill. App. 3d 1026, 1037-38 (1995), appears to argue that retaining the words "or obstructing" in the definition and issues instructions

demonstrated that he was not informed, and the jury instructions did not reflect, the acts of defendant that the State sought to prove. To be sure, jury instructions should confine the jury's attention to the theories the State sought to prove. *Id*. at 1038. Here, however, the charging instrument, as well as the discovery process and pre-trial proceedings, sufficiently informed defendant that he would have to defend against the allegation that he violated section 31-1(a-7) of the Code in that he tried to prevent the officers from opening the door and that his actions proximately caused Johnson's injuries. The jury instructions, in turn, confined the jury's attention to that theory.

¶ 89 The jury instructions correctly set forth the definition and issues for the charged offense. The trial court did not abuse its discretion in retaining the words "or obstruct" in the definition and issues instruction, and, in any event, there is no indication that defendant was prejudiced by the court's decision.

¶ 90 D. Jury Instruction: Deadlocked Jury

¶ 91 Defendant argues that the following exchange during deliberation rendered his trial unfair:

"[Note from the jury]: If no agreement is reached, how do we proceed?

[Answer from the trial court]: You will be brought back and given further instruction."

In defendant's view, the jury's question indicated that it was deadlocked, and the court should have responded with the Illinois Pattern Jury Instruction that was designed to provide guidance to deadlocked juries. That instruction, IPI Criminal No. 26.07, provides:

"26.07 Deadlocked Jury Supplemental Instruction. The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty, as jurors, to consult

with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

¶ 92   IPI Criminal No. 26.07 is consistent with guidelines set forth in *People v. Prim*, 53 Ill. 2d 62, 75 (1972), for instructing deadlocked juries. In deciding to give a *Prim* instruction, the trial court may consider the length of time already spent deliberating and the complexity of the issues before the jury. *People v. Chapman*, 194 Ill. 2d 186, 222 (2000). A court's decision to give a *Prim* instruction is reviewed for an abuse of discretion. See *id.* Typically, reversal is warranted when the court affirmatively instructs the jurors to heed the majority as a means of securing a verdict but not when the court merely declines to give a *Prim* instruction. *People v. Gregory*, 184 Ill. App. 3d 676, 681 (1989).

¶ 93   Turning to the instant case, we note that defendant has failed to provide a complete record on appeal. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). The transcripts from the report of proceedings contain no discussion of this jury question. As such, we cannot be sure that defendant objected to the court's answer. If defendant failed to object to the answer, then he forfeited the issue. *People v. Reid*, 136 Ill. 2d 27, 38 (1990).

¶ 94    Incomplete record and forfeiture aside, we see no indication that the trial court abused its discretion.  Again, the purpose of a *Prim* instruction is to give guidance to a jury that is not hopelessly deadlocked.  *Gregory*, 184 Ill.  App. 3d at 681.  When encouraging a jury to continue deliberating, the court must be careful not to imply that the majority view is the correct one.  *Id*. It must keep the instruction simple, neutral, and not coercive.  *Id*.

¶ 95    That is precisely what the trial court did here.  Under any reasonable reading, the words written by the court were not coercive.  The court did not encourage the jury to accept the majority view or even to reach a verdict.  Rather, the court informed the jury that, if asked, it would provide further instruction, after which the jury could continue to deliberate.

¶ 96    We disagree with defendant's assertion that the "short time" between the trial court's answer and the verdict supports that the jury was coerced.  The length of time a jury spends deliberating is not, on its own, determinative of whether a trial court exerted pressure on the jury to reach a verdict.  *Gregory*, 184 Ill. App. 3d at 682.  Moreover, in this case, the jury deliberated for approximately 7 hours and 15 minutes total, 3 of which occurred after the court informed the jury that, if asked, it would provide further instruction.  That the jury returned a verdict without asking for further instruction does not mean the jury was coerced.  The court did not abuse its discretion.

¶ 97                                   E. Closing Argument

¶ 98    Defendant argues that the State's closing argument was improper because it mischaracterized Officer Christoffel's testimony.  According to defendant, the State argued that Christoffel saw defendant "stick his head out the door and look around."  However, Christoffel testified only that he saw defendant's face in the opening of the door and that, while defendant's eyes were open, he could not know for certain what defendant had seen.  Defendant argues that

the State's mischaracterization of Christoffel's testimony was prejudicial because it incorrectly suggested defendant knew the police, as opposed to intruders, were at the door.

¶ 99 Defendant has forfeited this argument, because he did not object at trial to the State's characterization of Christoffel's testimony. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (the defendant must object both at trial and in a written posttrial motion to preserve an issue for appellate review). By failing to object at trial, defendant deprived the court of an opportunity to cure the error. See *People v. Slabaugh*, 323 Ill.App.3d 723, 731 (2001) ("the prompt sustaining of a defense objection and an instruction to disregard the improper statements will generally cure any error"). Defendant did, however, raise the issue in a post-trial motion, which the trial court summarily denied.

¶ 100 Forfeiture aside, we note that the State is given wide latitude in closing argument. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). It may comment not only on the evidence, but also on any reasonable inference drawn therefrom. *Id.* The State's argument must be viewed in its entirety and any challenged remarks must be viewed in context. *Id.* To warrant a new trial, an improper comment must have so prejudiced defendant that it is impossible to say whether the comment contributed to the conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Our supreme court has issued conflicting instruction on the standard of review to be applied to the question of whether an improper closing argument warrants a new trial. Compare *id.* at 121 (*de novo*), with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (abuse of discretion). Under either standard, however, we agree with the trial court's summary denial of defendant's request for a new trial.

¶ 101 The State did not mischaracterize Christoffel's testimony. It did not, in fact, argue that Christoffel saw defendant "stick his head out the door and look around." Rather, that is the phrase *defendant* used in closing to describe the State's closing argument. The State had merely argued

that Christoffel saw defendant's "eyes loo[k] out the door," and that Christoffel saw defendant "look out the door." In rebuttal, the State appeared to acknowledge that Christoffel could not know for certain what defendant saw, but that a fair inference could be made that defendant saw the police, because the door swung open 1 to 1 ½ feet, defendant's face appeared in that opening, and defendant's eyes were open.

¶ 102   The question of whether defendant looked but failed to see, or register, the police officers was adequately presented to the jury. Any arguable misrepresentation of Christoffel's testimony by the State was so extraordinarily slight that it cannot have been prejudicial. This is especially true where the evidence overwhelmingly established that the police otherwise made their presence known. Moreover, any confusion over Christoffel's testimony was certainly resolved when the jury asked for, and received, the transcripts of Christoffel's testimony. Defendant's argument fails.

¶ 103                              III. CONCLUSION

¶ 104   For the reasons stated, we affirm the judgment of the trial court of Kane County.

¶ 105   Affirmed.